IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| MICHAEL GARNER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 1:04-CV-325-WKW |
| ) | (WO) |
| WIREGRASS MENTAL HEALTH, INC., ) | |
| d/b/a SPECTRACARE, d/b/a THE ) | |
| HAVEN, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

This cause is before the court on defendant's Motion for Summary Judgment (Doc. # 23) filed on June 17, 2005. For reasons to be discussed, the court finds that the motion is due to be GRANTED.

**I. FACTS AND PROCEDURAL HISTORY**

The facts contained in the parties' evidentiary submissions, viewed in a light most favorable toward the non-movant, show the following:

Plaintiff Michael Garner ("Garner"), a white male, was employed by Wiregrass Mental Health, Inc. ("The Haven") from August 28, 2002, to January 8, 2003. He worked as a Relief Resident Manager at The Haven, a 28-day residential substance abuse treatment program. At all relevant times, Garner was a probationary employee.[1] Garner's immediate supervisor was Diane

---

[1] The Haven has a six-month probationary period for new employees. According to the employee handbook, probationary employees are not entitled to the same treatment for infractions as non-probationary employees. Specifically, the defendant's Personnel Policies and Procedures Manual states that The Haven is not "precluded from terminating an employee during the probation period without notice. . . . Termination of employment during this period does not require the stages of disciplinary actions as addressed in other parts of these policies. The policy on grievance procedures does not apply to an employee terminated while in probation status." (Def.'s Ex. A-1 at 9.)

Odom Cotter ("Cotter"), director of The Haven. Cotter reported to Melissa Medford ("Medford"), director of substance abuse programs. Starla Dowling ("Dowling") was SpectraCare's personnel director, and Ed Enloe ("Enloe") was the executive director of SPECTRACARE. Personnel decisions regarding termination went through a chain of command, from Cotter to Medford, to Dowling, and finally to Enloe. Enloe had final authority to approve or reject a recommendation of termination.

As a relief worker, Garner was "on call" to come into work as needed. His job duties included generally supervising clients/residents of the facility. He made sure clients attended AA meetings, went to meals and kept the dorms clean. He also served as a relief cook or a relief security guard when needed. The Haven serves a multi-racial clientele and has a policy with respect to social activities off-campus requiring participation of the entire group of clients for any such activity. On occasion, Garner assisted with off-campus activities.

In October of 2002, The Haven's clients attended an event called Judgment House, which was sponsored by Ridgecrest Baptist Church, a church Cotter had attended. Garner was one of the employees who accompanied the clients to the event. Following this event, two clients approached Garner separately and initiated conversations regarding race. On the evening they attended the Judgment House, Client One,[2] an African-American male, told Garner that he felt out of place because there were no other black people involved in the event. He also told Garner that he did not like the fact that clients were forced to attend church services every week at The Haven when there were no black ministers there to lead the services. This client also told Garner that he was troubled

---

[2] In order to protect their confidentiality, all clients of The Haven are being referred to by number rather than name.

by the fact that there were no black counselors on staff, and he felt that there was no one he could relate to.  The day following the Judgment House trip, Client Two, also an African-American male, approached Garner and told him he felt he should not have been forced to attend the event because he was Muslim.  The next week, Garner relayed these concerns to Cotter, who told him she had not been aware of the problems but would take care of them.  Cotter denies ever having this conversation with Garner.

In December of 2002, Garner received a performance bonus, despite the fact that he was still a probationary employee.  Employees on probation are normally not eligible for performance bonuses, but an employee's supervisor can request that an exception be made.  Cotter requested that Garner be paid a bonus as a reward for his good work.

Also that December, Garner and Cotter had a discussion regarding the churches they each attended.  Garner invited Cotter to attend his church, King's Table Church, and informed her that it was the largest racially integrated church in southeast Alabama.  Garner also asked Cotter if the clients at The Haven could attend a New Year's Eve event at his church; it was Garner's understanding that Cotter approved the trip.

After Garner and Cotter had this conversation, another African-American client, Client Three, approached Garner with a concern.  Client Three complained that The Haven did not have any black preachers at its Sunday worship services.  Garner relayed this complaint to Cotter.  According to Garner, Cotter told him that they did not have black preachers because they did not want the services to last all day.  Cotter denies that this conversation took place.  The Haven claims that both black and white pastors regularly hold services at the facility.  Garner has presented no evidence to dispute this.

3

On New Year's Eve day, Cotter informed Garner that the clients would not be able to attend the event at his church that evening because there were not enough drivers to accompany the clients. Although they had three drivers, Medford had told Cotter that was not enough. The Haven had previously transported clients to AA or NA meetings with three drivers, but they had used more drivers to take clients to the Judgment House event. Garner claims that Cotter told him the clients could not attend the church because it was not a "regular church" – that is, because it was integrated.

After Client Three had completed the program at The Haven, Garner saw him at an AA meeting; he gave the client his phone number. Client Three invited Garner to speak at his church, and Garner accepted the invitation. Client Three subsequently called Garner and suggested a Friday night for Garner to speak at the client's church. When Garner spoke at the church, The Haven was never mentioned. The church's associate pastor asked Garner to speak again the following week, and Garner agreed. Client Three ate dinner with Garner that evening at Garner's home.

The next day, Saturday, Garner was called into work at The Haven. When he arrived, he walked by a group of female clients standing in front of the doorway to the male dorms. As he passed by the group, Client Four, a female, stopped him and began talking to him about a disciplinary measure she had received from the female resident manager on duty. The female manager came outside and spoke harshly to Garner. Shortly afterward, the female manager and Client Four began shouting at one another. Garner and another male resident manager assisted in getting the client to calm down, and the situation was diffused. Garner worked at The Haven the rest of the weekend.

The following Monday, January 6, 2003, Cotter decided to recommend Garner's termination. She prepared a memo and discussed her recommendation with Medford, director of substance abuse

programs, who agreed with the recommendation. Cotter did not discuss this recommendation or any of the allegations in her memo with Garner prior to submitting the memo to Medford.

On Tuesday, January 7, 2003, a female client, Client Six, was found to have prescription and over-the-counter medications in her possession in violation of The Haven's rules. She claimed to have received pseudoephedrine, an over-the-counter medication, from Garner. Client Six was dismissed from The Haven.

Cotter's original memorandum, and the new information regarding Client Six's accusation, were forwarded to Dowling, the personnel director. Dowling called Enloe to discuss the termination recommendation. Enloe approved the termination based upon the information relayed through Dowling. Cotter called Garner on Wednesday, January 8, 2003, and asked him to come in to work. When he arrived, Cotter told him his employment had been terminated. In her memo, Cotter cited the following as reasons for termination: the fact that Garner had fraternized with clients outside of work; that he had told another staff member that "they would just have to get over it" when confronted about this; that Garner had talked about other staff behind their backs in an attempt to create discord among staff members; that he failed to follow directions in the kitchen when serving as a relief cook; and that he failed to adequately enforce the rules around the clients. Cotter also cited the accusation of Client Six regarding outside medication as a reason for Garner's termination. Garner denied that he had brought outside medication to Client Six, denied that he had failed to follow directions in the kitchen, and claimed that he was not aware of any anti-fraternization policy with regard to former clients.

Garner filed a charge of race discrimination and retaliation with the EEOC on May 27, 2003, within 180 days after his termination. After receiving a Notice of Right to Sue from the EEOC,

Garner filed a Complaint against Wiregrass Mental Health in this Court on April 6, 2004, alleging claims of race discrimination, retaliation, and hostile work environment. On June 17, 2005, The Haven filed a Motion for Summary Judgment (Doc. # 23). Garner filed a responsive Memorandum Brief in Opposition to Defendant's Motion for Summary Judgment (Doc. # 31) on July 21, 2005, and The Haven filed a Reply Brief (Doc. # 33) on August 1, 2005.

## II. JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. The parties contest neither personal jurisdiction nor venue.

## III. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories,

6

and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## IV. DISCUSSION

*A.     Discriminatory Termination*

In this case, Garner brings claims under both Title VII and 42 U.S.C. § 1981. These claims "have the same requirements of proof and use the same analytical framework"; therefore, the Court will "explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well." *Standard v. A.B.E.L. Servs.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Title VII provides that it is illegal for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to the full and equal benefit of all laws and proceedings for the security of persons and property . . . ." 42 U.S.C. § 1981(a).

Because Garner presents circumstantial, rather than direct, evidence of discrimination, this

case is governed by the analysis found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this test, the plaintiff has the initial burden of establishing a *prima facie* case of unlawful employment discrimination. *Id*. at 802; *Young v. Gen. Food Corp*., 840 F.2d 825, 828 (11th Cir. 1988).

To establish a *prima facie* case, Garner must show that: (1) he belongs to a protected class; (2) he was subjected to adverse employment action; (3) he was qualified to do the job; and (4) his employer treated similarly situated employees outside his classification more favorably. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). There is no dispute that the first three prongs of this test have been met. Although Garner is white, this court has recognized that a person of any race has the right to be free from racial discrimination. *See Sasser v. State of Ala. Dep't of Corr.,* 373 F. Supp. 2d 1276, 1285 (M.D. Ala. 2005) (noting that all instances of racial discrimination are unconstitutional, no matter what the race of the plaintiff). Further, the defendant has not argued that Garner was not initially qualified for the position of relief resident manager. Finally, termination qualifies as an adverse employment action. The fourth requirement for a *prima facie* case is where the dispute in this case lies.

The Haven argues that Garner was not treated less favorably than similarly-situated co-workers of a different race. Garner's main argument with regard to a similarly-situated co-worker revolves around Robin Cook, an African-American male who held the position of full-time resident manager at The Haven. Cook's employment history with The Haven is longer than Garner's, and it is useful to recount the highlights here for the sake of comparison. Cook was hired to work at The Haven in March of 1998. (Pl.'s Ex. 23.) In July of 1998, Cook was accused of having inappropriate

contact with female clients and of losing his temper and cursing at a group of clients. (Pl.'s Ex. 18.) After an investigation, Medford concluded that there was not enough credible evidence for any action to be taken regarding the allegations of inappropriate contact with female clients. (Pl.'s Ex. 19.) For losing his temper, he was reprimanded, suspended for one week, and his probationary period was extended for an additional six months. (Pl.'s Ex. 21.) In August of 1999, after being warned about establishing clear boundaries with clients, Cook was terminated for "fraternization with a female client." (Pl.'s Resp. at 25; Pl.'s Ex. 24.) After he was fired, Cook underwent counseling on his own initiative for "codependency" and "relationship boundary" issues. (Pl.'s Ex. 22.) In February of 2000, Cook was re-hired by The Haven and is still employed there as a resident manager. (Pl.'s Ex. 23.) Since being re-hired Cook has, on at least one occasion, given Client Three a ride to an AA meeting. (Cook Dep. at 29.) Cotter claims she was not aware of this fraternization with a client until it was brought to her attention by Garner after commencement of this lawsuit. (Cotter Dep. at 19-20.) Cook has admitted to Cotter that he gave this client a ride once when the client had no other transportation to a meeting; Cotter and Medford claim that Cook has not been reprimanded or terminated for this action because he admitted that he knew his action was wrong and that he told them would not do it again. *Id*. Because Garner was terminated for, among other things, fraternization, Garner claims he was treated differently than Cook.

The Eleventh Circuit has held that, in order to make such a comparison for the sake of showing discrimination, the plaintiff and the other employee must be "similarly situated in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). "[T]he quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia*

*v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir.), *opinion modified by* 151 F.3d 1321 (1998). "The most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishment imposed." *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001), *cert. denied*, 535 U.S. 1013 (2002) (citations omitted).

It is undisputed that Robin Cook was previously warned, in writing, about the need to avoid fraternizing with clients and to establish appropriate boundaries while he was in his probationary period as a resident manager. When Cook's job performance was found to be in need of improvement, his supervisor[3] informed him of this need, appropriately reprimanded him, and extended his probationary period. Cook was fired for this offense only after he had been warned that continued infractions could result in termination. Further, after he was re-hired, he again fraternized with a client by providing Client Three with a ride to an AA meeting on at least one occasion[4]. Cook was not reprimanded or terminated for this infraction. Cotter claims this is because Cook acknowledged his mistake and promised not to do it again. Garner, on the other hand, was never given a written warning regarding his inappropriate behavior with this same former client, nor was he given the opportunity to explain his behavior or improve. He was fired without warning for

---

[3] During Cook's first period of employment, Cotter was not his supervisor.

[4] An affidavit from Client Three indicates that Cook provided him with transportation on more than one occasion, but Cotter indicated she was only aware of one occasion.

committing a rule violation that, for Cook, had resulted in a written warning and reprimand.[5] Garner, however, has produced no evidence that he acknowledged his mistake or made any promises not to engage in the same behavior in the future. In fact, the defendant claims that Garner displayed a defiant attitude about breaking the anti-fraternization rule. (Cotter Dep. 132-33; Termination Memo.) In addition, Garner was a probationary employee; at the time Cook fraternized with Client Three, he was not a probationary employee. Further, at the time of Cook's probationary offense, Cotter was not his supervisor. For these reasons, Garner and Cook are not similarly situated.

Garner points to Gloria Faulk, a cook at The Haven, as another comparator. It is true that, because Garner sometimes served as a relief cook, he was at times performing the same job as Faulk. Faulk received written reprimands for fraternizing with clients in the dining hall, among other infractions. However, Faulk was not a probationary employee when she was reprimanded for not following the rules, and therefore, she and Garner were not identically situated. Because Garner has not identified similarly situated employees who were treated more favorably, he has not provided sufficient evidence to establish a *prima facie* case of discriminatory termination based on race.

Even assuming, *arguendo*, that Garner could establish a *prima facie* case, he cannot establish that the defendant's proffered legitimate reasons for termination are mere pretexts and that discrimination *vel non* motivated The Haven. After the plaintiff has established a *prima facie* case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. Chapman, 229 F.3d at 1024. The employer's burden is "exceedingly light," requiring only that the employer offer evidence that could lead a rational fact-finder to believe the decision was not discriminatory. *Turnes v. AmSouth Bank, N.A*, 36 F.3d 1057, 1061 (11th Cir.

---

[5] *See* footnote 3. Two supervisors may react differently to a rule violation.

1994). At this stage, the employer has only the burden of production, not of persuasion. *See, e.g., Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-55, 258 (1981); *McDonnell Douglas*, 411 U.S. at 802. It is not necessary that the court believe the evidence; the court's analysis "can involve no credibility assessment." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). If the employer is able to satisfy this burden, "'the McDonnell Douglas framework—with its presumptions and burdens'—disappear[s] and the sole remaining issue [is] 'discrimination vel non.'" *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142-43 (2000) (citing *St. Mary's Honor Ctr.*, 509 U.S. at 113, and *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983)). The defendant claims that a primary reason Garner was terminated was the accusation by Client Six that Garner had brought her over-the-counter medication. Cotter's initial recommendation to fire Garner was based on other factors, but the incident involving Client Six was included in her final recommendation which was given to Enloe. Enloe has stated that this factor alone—the accusation that Garner gave over-the-counter medication to a client—would have caused him to terminate Garner. (Enloe Dep. at 78:8-18.)

The burden now shifts back to Garner to demonstrate that the defendant's reasons are merely pretexts. "[T]o avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) (citation omitted). "A reason is not pretext for discrimination 'unless it is shown both that the reason was false, *and* that discrimination was the real reason.'" *Johnson v. Atlanta Independent School System*, 137 Fed. Appx. 311, 315 (11th Cir. 2005) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515 (emphasis in original)). The plaintiff may meet this burden by pointing out "weaknesses, implausibilities, inconsistencies, incoherencies, or

12

contradictions in the employer's proffered legitimate reasons for its action." *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004). The Supreme Court has held that a "plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148. Garner has not produced any evidence to demonstrate that Enloe would not have terminated him for the sole reason that a client accused Garner of providing her with over-the-counter medication. Because Garner has not demonstrated that this stated reason was pretextual, the court does not need to reach any other proffered reasons (such as Garner's fraternization with clients or his unteachable attitude). "The general rule in analyzing discrimination claims based on circumstantial evidence is that when a defendant has articulated several different reasons for an employment action, a plaintiff must demonstrate that *each of the proffered reasons* is unworthy of credence in order to establish pretext." *Lewis v. Chattahoochee Valley Community College,* 136 F. Supp. 2d 1232, 1239 (M.D. Ala. 2001) (emphasis added). Garner cannot demonstrate that each reason articulated by the defendant is unworthy of credence.

In addition, Garner simply has not demonstrated that his termination was in any way motivated by race. Without evidence of discrimination, Garner cannot meet his burden of establishing that a genuine issue of material fact exists as to his claim of discriminatory termination. "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Wilson*, 376 F.3d at 1092 (11th Cir. 2004) (citing *Holifield*, 115 F.3d at 1562). The defendant's Motion for Summary Judgment on the claim of discriminatory termination is therefore due to be granted.

B.     *Retaliatory Termination*

Title VII states, in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). A plaintiff may prove a *prima facie* case of retaliation by showing that "(1) he engaged in statutorily protected activity, (2) he suffered an adverse employment action, and (3) there is some causal relation between the two events." *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998) (citations omitted). "To establish that a plaintiff engaged in statutorily protected expression, . . . a plaintiff must show that []he 'had a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'" *Phillips v. Hibbett Sporting Goods, Inc.*, 329 F. Supp. 2d 1280, 1292 (M.D. Ala. 2004) (quoting *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002)). The Eleventh Circuit has held that "the protection afforded by the statute is not limited to individuals who have filed formal complaints, but extends as well to those . . . who informally voice complaints to their superiors or who use their employers' internal grievance procedures." *Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989). "The causal link element is construed broadly so that 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (citations omitted).

In the present case, Garner argues that he engaged in statutorily protected activity when he relayed the complaints of three clients to Cotter. Two clients told Garner that they had been dissatisfied with some aspect of the Judgment House event—one for racial reasons, and one for

religious reasons. The third client complained to Garner that there were not any black pastors who came to preach at The Haven on Sundays. While these comments, when reported by Garner to The Haven, could be construed as informally voiced complaints to an employer, Garner has offered no evidence that he had a good faith belief that The Haven was engaged in unlawful *employment* practices; he has only offered evidence that he informed Cotter of the concerns of three *clients*. An environment that is discriminatory to clients is not the same situation as an employer engaging in unlawful employment practices. Garner did not complain about an employee being treated unfairly; nor did he complain about any personal harassment or discrimination. His conduct fails to meet the first criteria of a *prima facie* case of retaliation.

Even if these actions could be construed as engaging in protected activity, Garner has still failed to prove the other elements of a *prima facie* case of retaliation, because he has failed to show a link between his statements to Cotter and his termination. Two of the three complaints he relayed to Cotter were discussed in early November, just after the Judgment House event. However, it is undisputed that in December, Garner received a performance bonus that had been requested by Cotter. Rather than suffering an adverse employment action after informing Cotter of the clients' concerns, he received a bonus—a tangible expression of her approval of his performance. Garner has simply not offered any evidence to establish a link between his statements regarding clients' racial and religious concerns and his termination. The Haven's Motion for Summary Judgment on the claim of retaliation is therefore due to be granted.

C.     *Hostile Work Environment*

To prove a *prima facie* case of hostile work environment harassment based on race the plaintiff must show: "(1) that he belongs to a protected group; (2) that he has been subject to

unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee . . .; (4) that the harassment was sufficiently severe or pervasive to alter the terms or conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). The Supreme Court has stated that an "objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

In the present case, Garner has offered no evidence to demonstrate that he was subject to harassment of any kind. Garner's claims indicate that he found the environment at The Haven to be generally hostile toward black employees and clients (though such a claim contradicts his claim of discriminatory termination based on the fact that he is white). In his EEOC charge, Garner stated, "I became aware of the racially discriminatory environment almost immediately." (Pl.'s Ex. 12 at 1-2.) Even if this conclusory statement were true, Garner has not shown how general hostility subjected *him* to unwelcome harassment based on his race. Further, he has not demonstrated how his working conditions were altered or in what way he found the atmosphere at The Haven to create an abusive working environment. In short, Garner has entirely failed to meet the burden for establishing a *prima facie* case of a hostile working environment. The Haven's Motion for Summary Judgment as to the claim of hostile work environment, therefore, is due to be granted.

## V.  CONCLUSION

Construing all facts presented in the light most favorable to Garner, the Court finds that Garner has not demonstrated that a genuine issue of material fact exists with regard to his allegations

of discriminatory termination, retaliation and hostile work environment.

 Therefore, it is hereby ORDERED that:

 1. The defendant's Motion for Summary Judgment (Doc. # 23) is GRANTED.

 2. The pretrial conference set for April 3, 2006 is CANCELLED.

 3. The clerk is DIRECTED to remove this case from the May 15, 2006 trial docket.

 A final judgment will be entered in accordance with this order.

 DONE this the 31st day of March, 2006.

        /s/   W.  Keith Watkins
       UNITED STATES DISTRICT JUDGE